# Millward-Cliff Cracker Co.'s Estate.   Appeal of Philler et al., Clearing House Committee.

161  157
181  338
161  157
191   96
161  157
195  214
161      157
203     4 10
161      157
25 SC  3 331

*Promissory notes—Corporation—Fraud.*

Unless expressly authorized by the by-laws, or by the directors or stockholders, the treasurer of a corporation has no authority to sign or indorse a promissory note in the name of the corporation.

A promissory note signed by the treasurer of a corporation, without the counter-signature of the president as required by the by-laws, is not binding upon the company, if the company has received no benefit from the note.

*Corporation—Power of officers—By-laws—Notice.*

In Pennsylvania, by-laws of a corporation when adopted become written into the charter, and not only define and limit the rights, duties and powers of the officers inter sese, but, so far as those with whom such corporation

has dealings are concerned, put such parties upon notice in treating with such officers, as to the extent of their power and agency, whether the specific by-law has been brought home to them or not.

*Banks—Promissory notes—Corporation—Fraud—Estoppel.*

Where the president of a bank accepts for discount notes of a corporation, knowing them to have been executed in fraud of the corporation, the bank is estopped from asserting that the notes were issued in the exercise of an apparent authority in the treasurer to issue notes, because of the long continued issuance of similar notes which the corporation had duly honored without objection.

Argued March 26, 1894. Appeals, Nos. 226, 277, 278, 323 and 358, Jan. T., 1894, by George Philler et al., Clearing House committee, B. F. Fisher, receiver of the Spring Garden National Bank; Tradesmen's National Bank of New York; National Bank of the Republic of New York; and Hanover National Bank of New York, from order of C. P. No. 1, Phila. Co., June T., 1891, No. 505, dismissing exceptions to auditor's report, distributing assigned estate of the Millward-Cliff Cracker Co. Before GREEN, WILLIAMS, McCOLLUM, MITCHELL and FELL, JJ. Affirmed.

Audit of account of Charles E. Lex, Esq., assignee for benefit of creditors of Millward-Cliff Cracker Company.

The auditor, Joseph De F. Junkin, Esq., reported as follows :

" The following claims were presented, all based upon promissory notes upon which the name of the Millward-Cliff Cracker Company appears either as maker or indorser, to wit: [Here follow twelve notes held by the different appellants.]

" The signature or indorsement upon all of these notes, as far as the assignor is concerned, was the same, to wit: ' Millward-Cliff Cracker Company, Frank H. Brenton, Treasurer.' The president's counter-signature does not appear upon any of them.

" The validity of these claims as against the fund was earnestly contested by the assignee and the assignor, and on behalf of some of the creditors, and a large amount of testimony was taken concerning them. From this testimony your auditor finds the following facts :

" As before noticed, the assignor is a corporation incorporated upon December 31, 1884, under the general incorporation act of 1874, its certificate of incorporation containing nothing beyond the bald requisites of the act.

"Upon January 12, 1885, the corporation passed the following by-law, among others:

"'By-law, section II, Millward-Cliff Cracker Company:

"'The treasurer will give bond in the sum of one thousand dollars, shall receive all money, and make all payments and furnish a report of the receipts and payments at the monthly meetings of the board of directors. He shall be the only authorized person to sign checks and obligations for the corporation, and no check or obligation signed by him will be good unless countersigned by the president of the corporation. He shall keep a separate account as treasurer in such bank or banks as the board of directors may from time to time designate. He shall also keep the accounts of the corporation, which shall include a set of double entry books for the business, with a separate set for the pie department of the business.'

"Whether any obligations of the corporation had been given prior to that time, did not appear, nor, if any were given, what form they took. But it did clearly appear, and your auditor finds, that, from that time until the assignment, a large amount of money, running into hundreds of thousands of dollars, was obtained by the president and treasurer from various institutions and persons, upon notes and indorsements, exactly similar in form to those in question, without the counter-signature of the president, such money being for the use of the corporation, and the notes being met at maturity, from time to time, with moneys of the corporation. The president and treasurer also, upon numerous occasions during these years, gave similar notes, which were met at maturity, in liquidation of the corporation's indebtedness. And not until shortly before the assignment did any of the corporation paper contain the president's counter-signature, and then only in a few instances. No counter-signature of an indorsement was produced.

"Your auditor also finds that during all this time the same president, Ephraim Young, and the same treasurer, Frank H. Brenton, were in office. [He also finds that the course thus pursued by the president and treasurer was not called to the attention of the directors of the company, either as a body or individually, and was entirely unknown to the stockholders at large.] [8]

"It appeared that the treasurer would make his stated reports

to the board of directors and the corporation, of moneys borrowed and paid in the aggregate, and the notes were not produced to them.   In other words, it distinctly appeared that, practically from the inception of the corporation business, down almost to the day of the assignment, the executive officers of the company had ignored the by-law in the assumption of such corporation obligations, and, either carelessly or ignorantly, placing their own construction upon it, treated it as a dead letter.   Had not the frauds occurred, which were discovered and are about to be mentioned, they might be pursuing this same course to this day.

" The notes for which the company thus received value appear to have been received and discounted in at least seven different banks and a number of business houses, and a course of dealing was thus established with such banks and houses.

" But, with the exception of the Spring Garden Bank, attention is called to the fact that none of the parties now claiming, holders of this paper, had had any previous dealings with the corporation or its officers upon paper of this character.   There was no course of dealing established with them.

" Beginning in 1885, it appeared that Francis W. Kennedy, then president of the Spring Garden Bank, induced Ephraim Young, who was a director in said bank, to have Frank H. Brenton, the aforesaid treasurer of the assignor, execute and deliver to the said Kennedy a series of notes, in the form mentioned, without the counter-signature of the president, which notes, whether made by the company ostensibly, or ostensibly indorsed by them, were all without consideration passing to the company, and were used by Kennedy and Young in fraud of the company's rights and for their own purposes.

" The transactions and frauds were long and complicated and the details are not needed for the purposes of this finding.   It is sufficient to say that by means of the books of the Spring Garden Bank, to each of the notes in question was fastened the fact that it was either an original note or a renewal of a note, the proceeds of which the Millward-Cliff Cracker Company did not receive, but which all went either to Kennedy or Young, and that, so far as the company was concerned, the notes were entirely without consideration.

" These notes or series of notes were all discounted through

Francis W. Kennedy's agency as president of said bank, he either discounted them between his board meetings and subsequently informed the board of the bank, or presented them at a regular meeting.   The proceeds of such notes, when discounted, went either into his personal account or into that of Ephraim Young.

" Such are believed to be the general and salient facts necessary to a correct understanding of the position taken by the corporation assignor, that as such notes were issued without consideration to it, and in fraud of its rights, they are not valid claims upon this fund, because they are not executed as required by the above mentioned by-law.   They admit that had consideration passed to the corporation for the same, it would be liable, but they claim that, lacking such element, the corporation is only bound by such obligations as are executed strictly in accordance with its law.

" The question upon its face appears to be clear-cut and simple, but its solution has been approached by your auditor with no little hesitation, in view of the magnitude of the interests involved, and the possible importance of the ultimate decision of this question to the community at large, it being one of first impression, at least in this state.

" Most able and exhaustive arguments were made by several of the learned counsel engaged in the cause, and no little light has been shed upon the matter by them.

" Much consideration has brought your auditor, however, to the firm conviction that all of these claims should be rejected, and he finds that none of them are entitled to share in this fund. A large number of authorities and text-books have been read and consulted, but, without referring in detail to them, he submits the following deductions and conclusions as having bearing upon the subject:

" [The controlling feature of the situation as between these claimants and the assignor, to the mind of the auditor, is found in the fact that the assignor is a corporation, and is purely a creature of statute.   Necessarily it can be governed, controlled, and held responsible only within the enabling and disabling lines of the statute.] [12, 13]

" That it could borrow money and cause obligations to be executed to secure the repayment of the same, which would be

valid as against it, seems obvious from the powers contained in its franchise.   Where the proceeds of such obligations went into the treasury of the corporation, and it received the benefit thereof, the form of such obligation would appear to be of little consequence, as such circumstance would estop any technical defence as to form.

"But such was not the case here.   From the obligations sought to be enforced, this corporation received no benefit, and their defence is simple—the obligation is not in the form provided for and required by the law of our existence ; we received nothing from it ; therefore we decline to recognize it, although it bears upon its face the name of an agent of ours, such agent, however, not having authority, express or implied, to so bind us.

"With great earnestness and ability the learned counsel for the claimants sought to impress upon the auditor that this defence was ill-founded for the following, among other reasons :

"(1) Because a by-law, such as the one in question, was simply a regulation inter sese, a private agreement, as it were, among the incorporators, which in no way could be binding upon outsiders, and therefore was not effectual here to prevent a recovery, when the paper bore the name of the corporation placed thereon by one of its duly elected agents.

"From the citations handed the auditor, it would seem that, in some cases, the force of certain by-laws has been so restricted, and it is, of course, in the very nature of by-laws that many of them should be applicable only to that extent.   And under the statutory provisions of several of the states, with reference to corporations, it is evident that by-laws of corporations of these states are only thus far effective.

"But, under our statute, the by-law becomes of the very essence of the corporation life.   The words of the statute are express : Act of assembly, approved the 29th day of April, A. D. 1874, sec 5 : ' The by-laws of every corporation created under the provisions of this statute, or accepting the same, shall be deemed and taken to be its law, subordinate to this statute, the charter of the same, the constitution and laws of this commonwealth, and the constitution of the United States. They shall be made by the stockholders or members of the corporation, at a general meeting called for that purpose, unless the charter prescribes another body, or a different mode.   They

shall prescribe the time and place of meeting of the corporation, the powers and duties of its officials, and such other matters as may be pertinent and necessary for the business to be transacted, and may contain penalties for the breach thereof, not exceeding twenty dollars.'

"It would be difficult to frame a charter, or draft a statute, where the modus operandi of the corporation life is less defined than under the laws of this state. With the exception of a few trifling provisions, the rights, duties, powers and responsibilities of the officers are left to be defined by the by-laws; in like manner, to them all matters regulating the methods of dealing with the public are confided; and your auditor is clearly of the opinion that such by-laws, when enacted, in so far as they touch upon the same or kindred matters, become written into the charter; and not only define and limit the rights, duties and powers of the officers inter nos, but so far as those with whom such corporation has dealings are concerned, put such parties upon notice in treating with such officers, as to the extent of their power and agency, whether the specific by-law has been brought home to them or not.

"As before said, this seems to the auditor to be clear, from the very words of the statute. But common sense and reason fortify such conclusions as well. Were this not the case, all stockholders in corporations would be at the mercy and whim of their officers, and those with whom such officers dealt. Necessarily, the corporation must act through its officers. Is the extent of their powers to bind the corporation to be a matter of implication at the will of those who deal with them, ostensibly for the corporation? The question seems to contain its own answer; and to also answer the second position of the claimants, viz.:

(2) "That there was implied in the right and duties of the treasurer of a corporation, the right and duty to execute and deliver obligations binding upon the corporation, virtute officii. Your auditor has searched the books in vain for any decided case sustaining such a proposition, and he does not believe that it is sustainable. Not only do the customs of corporations differ radically as to the execution of obligations, but there does not even seem to be anything in the position occupied by a treasurer to give a color of warrant for such a contention.

" A treasurer is one who holds or keeps the treasury. His duty is to receive and guard its funds and to expend them, not at his own whim, or upon his own judgment, but as directed by those vested with the authority under its law.

" While it is possible that a check, drawn fraudulently by a treasurer alone, where counter-signature of another officer was required, and upon the faith of which some innocent third person had acted to his detriment, might be binding upon the corporation, although your auditor doubts it, yet such a recognition of power in a treasurer is certainly the extreme limit to which this power could be carried by implication.

" The signing or indorsing of a promissory note, binding the corporation, is the execution of a solemn contract on behalf of the corporation, which, to the auditor's mind, is entirely beyond the purview of a treasurer's duty or power. Such power may be expressly conferred upon him by his constituents, but, until that is done, it should not impliedly extend so far. It is an executive act, and if any implication could carry such power, it should be vested only by implication in the executive head, the president.

" The fact that, with many corporations, the treasurer creates such obligations, without express authority, and that the public accepts the same as valid, does not strengthen the argument in favor of the implication, but only serves to emphasize the thought that the conduct of corporations is apt to be eminently careless and lawless, and to point the conclusion that the hour has come when a halt should be called upon practices such as these, and the officers of corporations and the public both be made to understand that stockholders, and others interested in corporation existence, have some rights and powers of limitations ; that an officer of a corporation is but an agent with limited authority, and that, in dealing with him as such, the public is bound to inquire into and be guided by the reasonable scope of such authority as defined in the law of his constitution, and as in the case of any other principal or agent.

" (3) This brings us to the third and most important of claimants' contentions, viz. : That these notes were issued in the exercise of the apparent authority of this treasurer, because of the long-continued issuance of similar notes, which the corporation had duly honored without objection. Upon its face, and at first

blush, the position has some strength, but when closely examined, such strength fades away.   As before found, none of the claimants, excepting the Spring Garden Bank, had had previous dealings upon similar notes with this corporation, so that the principle of estoppel, which might be invoked under such circumstances, has no application here.   As to rights of the Spring Garden Bank, under the facts, they will be considered hereafter.

" It was also found that, although the corporation did receive the proceeds of notes so issued, to a very large amount, extending over a series of years, yet, no one of the other officers or stockholders was ever made aware of the irregularity of such notes, nor of what the president and treasurer had been doing. [When discovered, the practice was promptly stopped, and measures taken to punish the wrongdoers.] [11]

" It is claimed that such continuous practice amounted to an abrogation of the by-law, and vested the treasurer with an apparent authority to issue notes and give obligations, equivalent, at law, to a real authority.   Such contention appears to the auditor as most specious.   It seems to him that it would be as sound an argument to claim that title would pass to an article stolen from one, who had been systematically robbed for years in a similar way and had made no outcry, either ignorantly or willfully, the person claiming having had no previous dealings with the thief or the owner.

" It is said by claimants that even had they made inquiry, they would have been told by these fraudulent agents that this was the customary way in which this corporation issued its notes ; and would have received a similar reply from those with whom it had had previous dealings.   That might or might not have been the result.   If inquiry had been made, the truth might have come out.   But the fact remains that not one of them did make inquiry, or endeavor to ascertain the extent of this agent's authority to bind his principals.   They assumed that he had such authority, and, in your auditor's opinion, in so assuming, also assumed all the risks attendant thereon, and have no one to blame but themselves.

" (4) The claimants further insist, fourth, that this defence is of the most technical character, raised to defeat honest and just claims, where good money has been parted with upon the credit of the corporation, and that as the president of the cor-

poration stood by and was cognizant, indeed the author, of the frauds, therefore such acquiescence was equivalent to his counter-signature, and the corporation should be liable.

" This thought also, at first blush, seems to contain some force, but its complete answer lies in the very fact that, of necessity, the business of a corporation must be conducted along technical lines. Its inception and whole existence is technical, and the only protection which its incorporators have consists in the strict and technical enforcement of the laws of the corporation, which are as open to those who choose to deal with it as they are to the stockholders and officers.

" As remarked at the commencement of this discussion, the corporation is purely a statutory creature, with its powers and limitations strictly defined, and this fact is or should be as patent to outsiders dealing with it and its officers, as to the incorporators themselves. In the ordinary business transactions of every day, no one would dream of charging a personal principal with the act of an agent, where his authority was not either expressed or clearly implied from the character of his agency. And where it was or should be known from the nature of his employment that the extent of the agent's authority must have certain defined limitations, the law casts the burden upon the party seeking to charge the principal of proving the scope of this authority. Such your auditor takes to be the position here. The very fact that the agent is an officer of a corporation, which is required by the statute to have by-laws expressing the extent of his powers, should put all persons dealing with him upon their guard in investigating the extent of his powers. Ignorantia legis neminem excusat.

" (5) But it is still further insisted upon by these claimants, fifth, that the enforcement of the equitable doctrine that, where one of two innocent persons must suffer, the party who puts it within the power of the wrongdoer to commit the fraud is the one who should suffer; and that here, the corporation having chosen to put officers in power who perpetrated these frauds, it should suffer as between it and themselves.

" The invocation of this doctrine might prove of service to the claimants, were the foregoing considerations out of the way ; but if the observations of your auditor with reference to the corporation and the relations sustained to it by those dealing

with it are well founded, it cannot be successfully maintained that these claimants are innocent parties within the principles of this doctrine.   They dealt, or are considered at law to have dealt, with these officers with their eyes open.   They were charged by law with knowledge of this by-law and its consequences, and are presumed to have known that the notes, to be valid against the corporation, require the president's counter-signature.   This doctrine is therefore without application here.

"Your auditor therefore finds that the by-laws of this corporation required that an obligation, to be binding upon it, should be signed by the treasurer and counter-signed by the president. That such by-law was valid and subsisting at the time that each of the notes in question was executed, and was not abrogated by the secret practice of such officers in executing obligations in a different manner.   [There was no apparent authority conferred upon the treasurer by such secret practice to execute obligations in any other manner which would be binding upon the corporation.] [14]   That there is no implied authority in the treasurer of a corporation to execute any obligation binding upon the corporation.   And that in this particular case, the parties claimant accepted their notes charged with the notice that the obligations of this corporation, to be valid, required execution in a particular way, and that none of the notes presented were so executed.

"The fact has been adverted to before that the Spring Garden Bank's position here differed from that of the other claimants in this, that there had been a long course of dealing between the bank and the assignor, whereby many thousands of dollars' worth of obligations, which the corporation had met when they matured and which were in the very form which the present obligations assume, had been discounted by the bank.   [Under such circumstances, the assignor would clearly be estopped from contesting the bank's claim, were it not for the other controlling fact, that the president of the bank, in accepting these notes for discount, knew them to have been executed in fraud of the assignor, and, indeed, procured their execution for his own purposes mainly.] [10]

"It is clear to the auditor that it is impossible to separate the knowledge of Francis W. Kennedy, as an individual, from his knowledge as such president.   The knowledge of the president of the bank necessarily charges his corporation in the

fullest manner, and your auditor ˙can conceive of no principle of law or equity which would render the assignor liable under such circumstances.   Indeed, the decided cases upon this subject clearly seem to point to the confirmation of the auditor's position.   He cites the following to that end: Holden v. New York, 72 N. Y. 292; Bank v. Town of New Bedford, 36 Conn. 93; Fishkill v. Bostwick, 19 Hunter, 354."

Exceptions to the auditor's report, among others to the findings in brackets, were dismissed without an opinion.

*Errors assigned* were dismissal of exceptions, quoting them.

*A. T. Freedley*, for appellant, the Clearing House Committee, cited: Bispham, Eq. § 265; Wood's Collyer on Partnership, § 464; Grafius v. Land Co., 3 Phila. 447; Boone, Corp. § 77; Ridgway v. Bank, 12 S. & R. 263; Moorehead v. Gilmore, 77 Pa. 118; R. R. v. Clarke, 29 Pa. 152; Mechanics' Bank v. Ry., 5 W. N. 290; Ins. Co. v. Smith, 11 Pa. 120; Royal Bank of India's Case, Law Rep. 4 Ch. Ap. 262; Fay v. Noble, 12 Cush. 1; Credit Co. v. Howe Co., 54 Conn. 357; 2 Morawetz on Corp. § 593; Boiset on By-laws, § 21; Taylor on Corp. § 196; Lerch v. Bard, 153 Pa. 573; Loudon Savings Fund v. Bank, 36 Pa. 503; Wright's Ap., 99 Pa. 432; Beach on Corp. § 212; Brooke v. R. R., 108 Pa. 529; Bank of Ky. v. Schuylkill Bank, 1 Parsons Eq. 248; Willis v. R. R., 6 W. N. 464; R. R. v. Schuyler, 34 N. Y. 30; Independent Bldg. Assn. v. Real Estate Title Co., 156 Pa. 181; United Fire Assn. v. Benseman, 4 W. N. 1; Morton v. Wysong, 51 Ind. 4; Mining Co. v. Bank, 104 U. S. 194.

*William S. Devine, Samuel B. Huey* with him, for appellant, The National Bank of the Republic of New York, cited: Act of April 29, 1874; Fifth Ward Savings Bank v. First National Bank of Jersey City, 7 Atl. R. 318.

*Hood Gilpin*, for appellant, The Hanover National Bank of the City of New York, cited: Ang. & Ames on Corp. § 284; Bank v. Pottery Co., U. S. C. C., 55 Fed. R. 265; Bisph. Eq. 265; Beach on Corp. § 205; Byles on Bills, 155; Chambers v. Bank, 75 Pa. 205.

*David H. Stone*, for appellant, Tradesmen's National Bank

of New York, cited: Greig v. Riordan, 33 Pac. 913; Ridgway
v. Bank, 12 S. & R. 255; Fleckner v. Bank, 8 Wheat. 362;
Bank v. Snow Cattle Co., 151 Mass. 74; DeKay v. Water Co.,
38 N. J. Eq. 158; Mechanics Bank v. R. R., 5 W. N. 290;
Ins. Co. v. Smith, 11 Pa. 126; R. R. v. Clarke, 29 Pa. 152;
Mining Co. v. Bank, 104 U. S. 192; Great Western Tele. Co.,
5 Bissell (U. S. C. C.) 363; Partridge v. Badger, 25 Barb.
146; Bissell v. R. R., 22 N. Y. 289; Bank v. Stone Dressing
Co., 5 Bosw. 275; Bird v. Daggett, 97 Mass. 494; Credit Co.
v. Howe Machine Co., 8 Atl. R. 472; Perry v. Council Bluffs
City Water Works, 8 Banking Law Journal, 437.

*David H. Stone,* for appellant, B. F. Fisher, receiver of the
Spring Garden National Bank, cited: Innerarity v. Bank, 139
Mass. 332; Bank v. Cushman, 121 Mass. 490; Bank v. Lewis,
22 Pick. 31; Barnes v. Gas Light Co., 12 C. E. Green 33; Bank
v. Christopher, 11 Vroom, 435; Winchester v. R. R., 4 Md.
231; Wickersham v. Zinc Co., 18 Kansas, 481; Bank v. Neass,
5 Denio, 329; Stevenson v. Bay City, 26 Mich. 44; Bank v.
Snow Cattle Co., 151 Mass. 74; DeKay v. Hackensack Water
Co., 38 N. J. Eq. 158; Bank v. Lovett, 8 Banking Law Jour-
nal, 361.

*John G. Johnson, Wm. Henry Lex* with him, for appellees,
cited: Twelfth Street Market Co. v. Jackson, 102 Pa. 269; 1
Daniel Neg. Inst. § 394; Edwards on Bills and Notes, § 65; 1
Parsons on Notes and Bills, 299; Atkinson v. Mfg. Co., 24.
Me. 171; Torrey v. Dustin Association, 5 Allen, 329; Craft
v. R. R., 22 N. E. R. 920; Credit Co. v. Howe Machine Co.,
8 Atl. R. 479; Beach on Corp. 362; Gt. Western Tel. Co., 5
Bissell, 363; Morawetz on Corp., p. 560; Ins. Co. v. Scott, 101
Pa. 457; Ridgway v. Bank, 12 S. & R. 263; R. R. v. Thaw,
29 Pa. 152; United Fire Assn. Co. v. Benseman, 4 W. N. 1.;
Brooke v. R. R., 108 Pa. 546; Wright's Ap., 99 Pa. 432; Bank
v. Christopher, 40 N. J. 436; Atlantic Mills v. Indian Orchard
Mills, 147 Mass. 273; Corcoran v. Snow Cattle Co., 151 Mass.
75; Bank v. Cushman, 121 Mass. 491; Innerarity v. Bank,
139 Mass. 334; Barnes v. Gas Light Co., 27 N. J. Eq. 36.

*A. T. Freedley,* in reply.—It is obvious that the effect of
appellees' propositions is to destroy the negotiability of notes;
for such contention is simply that promissory notes may be

good between the original parties, because such parties dealt directly with the corporation, and thus had a course of dealing with such corporation, while at the same time the notes are void in the hands of third parties for value, because such parties had not a course of dealing with the corporation. Such doctrine would, moreover, open an easy method to defeat honest debts, for a corporation need simply to pass a by-law, then ignore it for years, and then resurrect it against innocent holders of corporate obligations. Such is not the law, and it is well settled :

(1) When a corporation permits its treasurer to act as its general fiscal agent, and by its silence or acquiescence permits him to continually indorse notes on behalf of the corporation, the treasurer thereby becomes invested with apparent authority to indorse, and the corporation is bound by indorsements so made ; and this implied authority cannot be restricted by by-law provisions which have never been acted upon nor communicated to third parties : Fifth Ward Savings Bank v. First National Bank, 48 N. J. L. 514; Marine Bank v. Colliery Co., 5 N. Y. Sup. 292; Page v. Fall River Co., 31 Fed. R. 257.

(2) The implied authority arises not only from acquiescence after direct knowledge, but from the knowledge the board of directors is presumed to have and is bound to have of the manner in which the corporate business is being conducted : Martin v. Webb, 119 U. S. 7; Lester v. Webb, 1 Allen, 36.

(3) This implied authority can be relied upon not only by the party with whom the corporation has directly had a particular course of dealing, but by the general commercial public of which the claimants are members : Bank v. Colliery Co., 5 N. Y. Sup. 292; Ins. Co. v. Smith, 11 Pa. 110 ; Craft v. South Boston Co., 22 N. E. R. 920.

It was the duty of the board of directors to examine or know the manner in which the company's business was being conducted : Martin v. Webb, 110 U. S. 15; Mining Co. v. Anglo Californian Bank, 104 U. S. 194.

Per Curiam, April 16, 1894 :

We think the learned auditor in the court below has correctly pointed out the distinctions between the cases in which corporate liability is held, and those in which it is denied, in this class of causes. He held that where the corporation received the

benefits of the unauthorized action of its officers it was bound. Also that where a previous course of dealing of the same irregular character had been carried on, a liability arose notwithstanding the unlawful character of the paper, but that where there was no such previous course of dealing no liability arose as to the particular paper in question. And he held that in the case of the Spring Garden National Bank the fraud of its president, in contriving and negotiating the fraudulent paper for his own personal use, was with knowledge of the bank, imputed it is true, but correctly imputed, to his bank, and the paper thus held created no liability on the part of the Cracker Company. In these several findings we concur. None of the authorities cited for the appellant conflict with these findings where the facts were similar. Without engaging in a protracted discussion, which we think unnecessary, we affirm the decree of the court below substantially for the reasons stated in the report of the auditor.

Decree affirmed and appeal dismissed at the cost of the appellant.