WASHINGTON, A. & MT. V. RY. CO. v. REAL ESTATE TRUST CO. OF PHILADELPHIA.

(Circuit Court, E. D. Pennsylvania. February 4, 1910.)

No. 36.

1. BANKS AND BANKING (§ 315*)—OFFICERS OF DIFFERENT COMPANIES—UNLAWFUL ACTS—NOTICE.

There being no objection to the president of a trust company becoming financially interested in and an officer of other enterprises, the fact that complainant railroad company knew that one of its officers was also president of defendant trust company did not charge complainant with knowledge of such officer's dishonesty in the manipulation of complainant's bonds in the hands of the trust company, as trustee, nor did it show that complainant expected to obtain any unlawful advantage from such officer's official connection with the trust company.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1219-1221; Dec. Dig. § 315.*]

2. BONDS (§ 130*)—NEGOTIABILITY—INNOCENT HOLDER—BURDEN OF PROOF.

Corporate bonds payable to bearer being negotiable, if permitted by the maker to pass into the hands of an innocent holder without notice and for value before maturity, after being paid would constitute a liability on the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

maker, but. on proof of their fraudulent use, the burden would be shifted to the holder to establish good faith in the purchase, involving not only proof of lack of notice but of payment of a valuable consideration.

[Ed. Note.—For other cases, see Bonds, Cent. Dig. § 222; Dec. Dig. § 130.*]

**3.** Banks and Banking (§ 315*)—Liability for Fraudulent Acts of Officers—Ratification.

Where defendant trust company, through the intervention and fraud of its president, who was acting as the mutual agent of both defendant and complainant, received complainant's bonds, and defendant's president used the bonds as collateral for defalcations covered by loans to fictitious persons, defendant was not entitled to avail itself of the result of its president's fraud without responsibility therefor, and was therefore bound to return the bonds.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1219-1221; Dec. Dig. § 315.*]

**4.** Principal and Agent (§ 181*)—Fraud of Agent—Notice to Principal.

The rule that notice to an agent is not notice to the principal where the agent is acting in fraud of the principal, applies to certain wanton torts or wrongs committed by the agent, but not to a case where the principal acquired possession of bonds through its agent's fraudulent use of the power vested in him, in which case defendant could not hold the bonds without ratifying the acts and authority of the agent who transferred them.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 690; Dec. Dig. § 181.*]

**5.** Banks and Banking (§ 315*)—Trust Companies—Acts of Officers—Misappropriation of Bonds.

Where certain bonds of a corporation were placed in the possession of defendant trust company, as trustee, to be certified as called for, the fact that they were left in defendant's possession after the mortgage securing them had been satisfied, and that defendant's president, by virtue of his office, certified the bonds and used them as collateral to cover his own defalcations, did not entitle defendant to claim any rights under the bonds as against complainant.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 1218; Dec. Dig. § 315.*]

Bill by the Washington, Alexandria & Mt. Vernon Railway Company against the Real Estate Trust Company of Philadelphia. Decree for complainant.

Wm. B. Bodine, Jr., George Wharton Pepper, and R. Walton Moore, for complainant. George H. Earle, Jr., Joseph de F. Junkin, and John G. Johnson, for defendant.

HOLLAND, District Judge. This is a bill in equity instituted by the Washington, Alexandria & Mt. Vernon Railway Company to compel the defendant to deliver up to it for cancellation $48,000 par value of one lot of its bonds out of an issue of $200,000, secured by a mortgage dated July 1, 1892, which was satisfied of record by the trustees thereof on or about September 16, 1895, which bonds had been paid off by the complainant and never thereafter reissued by it, and also $50,000 par value of another lot of $750,000 of its bonds, secured by a mortgage dated August 1, 1895. Of this latter amount, the $50,000 in question had never been issued by the complainant company. The mortgage securing these bonds was duly satisfied of

record by the trustees on March 25, 1905. Both these lots of bonds, it is alleged in the bill, were used in fraud of the complainant by Frank K. Hipple, who was president of the defendant company, and who assigned the same as collateral for loans which he, representing the company, made in fact to himself, and that, for this reason, the complainant is in no respect estopped to deny liability upon the bonds. The defendant, in its answer, while not denying that the $48,000 lot had been paid off and that the $50,000 had not been regularly issued, insists that as the complainant company negligently permitted Hipple to have these securities, negotiable and valid upon their face, in his possession, it is liable for their par value and interest.

The bill, as amended, is an elaborate statement of the facts, nearly all of which are either established by the proofs or admitted by defendant. The latter states, in its brief, that "there is substantially no disputed questions of fact in the cause. The divergence of position and opinion arises from the inferences and conclusions of fact and law, to be drawn from such facts as the plaintiff has submitted, or which its witnesses have admitted." This is one of the questions, the solution of which is difficult, because the individual who committed the fraud was the implicitly trusted agent of both the complainant and the defendant. He fraudulently used the property of the complainant without its knowledge, but which was in his possession, because of the trust and confidence it placed in him, as collateral, to cover up an embezzlement of defendant's funds committed by him in the capacity of the latter's trusted agent, and, in the transaction, which was a fraud upon both, he was the sole actor. Which must suffer the loss, under the circumstances, is the question to be determined. From the bill as amended, and the answer, together with the testimony and the statements and admissions in the briefs, the following facts are clearly established:

The Real Estate Trust Company is a corporation of the state of Pennsylvania, doing business as a trust company in Philadelphia. The Washington, Alexandria & Mt. Vernon Railway Company is a Virginia corporation, organized for the purpose of conducting a railway to be constructed between Washington and Mt. Vernon, with lateral branches. A separate corporation was organized, known as the Mt. Vernon Construction Company, for the purpose of constructing the complainant's railway. The stockholders and officers of both the railway and the construction company were practically the same, and the four controlling men in both were James S. Swartz, Frank K. Hipple, David C. Leech, and G. E. Abbott. Hipple was, during all this time, president of the trust company, with practically absolute control of the same both in its management and the loaning of its funds, and was, at the same time, a director of the construction company from 1892 to 1906, and secretary of the railway company from 1903 down to August 24, 1906, the date of his death (with the exception of the year 1905). James S. Swartz was a director of the construction company and its secretary from 1893 to 1903, inclusive, with the exception of the year 1894, its treasurer from 1895 to 1903, and its president from 1903 to date. He was also a director of the rail-

way company and its vice president in 1892 and 1904. He was the active financial man of both the construction and the complainant company who sought advice in these matters from Hipple. The latter secured whatever loans were made by the trust company to the construction company. Swartz was the active man in securing many of the loans from other institutions for the construction company. In June, 1892, the construction company agreed with the complainant to build a line of railway for it between Alexandria and Mt. Vernon for $200,000 of complainant's bonds, together with certain stock, and on July 2, 1892, the complainant executed and issued 400 bonds of par value of $500 each, aggregating $200,000, payable on the 1st day of July, 1912, and to secure the payment of these bonds executed and delivered to James S. Swartz and Frank K. Hipple as trustees a mortgage or deed of trust conveying all the property of the complainant as security for the bonds, the principal and interest of which were made payable at the office of the trust company. These bonds were delivered to the construction company in payment for the construction of the road, and on November 1, 1892, the construction company borrowed of the trust company $40,000 on a note, secured by $48,000 of these bonds as collateral. In the summer of 1895 no interest having been paid on the bonds, and in order to provide for the payment for additional work, a new mortgage was to be executed for a larger amount, and Swartz, representing the construction company and the complainant, arranged with Hipple, as president of the trust company, that the latter should act as trustee in the new mortgage, and make a new loan to the construction company of $66,000, to be secured by $75,000 of the new bonds, provided the existing loan of $200,000 should be paid off out of the new issue.

Under date of August 1, 1895, the railway company executed and delivered to the defendant, to be certified when called for by the complainant's directors, 750 bonds of the par value of $1,000, each numbered from 1 to 750, both inclusive, aggregating $750,000 at par, and payable on the 1st day of October, 1925, with interest at 5%, payable semiannually, at the office of the defendant. To secure payment of these bonds a mortgage or deed of trust was executed and delivered to the defendant as trustee. The mortgage of 1895 recited that the bonds thereby secured were executed and delivered, inter alia, in order to make provision for the retirement of the $200,000 of bonds issued in 1892; and the mortgage further provided that the said bonds should not be binding upon the complainant until certified by the defendant as trustee, and that the complainant should deliver all of said bonds to defendant, and the defendant should certify and countersign said bonds and deliver them to the complainant when and as directed so to do by the latter's board of directors. The board of directors of the railway company directed the defendant as trustee to certify and countersign $700,000 of the said bonds, and to deliver them to the railway company. This direction was complied with by the trust company as trustee in the mortgage, but it was never directed by the railway company to certify the remaining $50,000 of the 1895 bonds remaining in its possession. Hipple, however, as president of

the latter company, without the knowledge of either complainant or the defendant, certified the $50,000 of bonds as president of the defendant company, which made it the act of the defendant company, and then used these bonds for the purpose of defrauding the latter. Hipple retained possession of the $48,000 of bonds of the 1892 issue after the bonds of 1895 had been substituted for the increased loan made by the trust company to the construction company, and Swartz, the other trustee, retained possession of the remainder of the bonds. At this time Swartz and Hipple were both directors of the railway company, and Hipple was its secretary, and both trustees in the 1892 mortgage. No other officer of the complainant company made any inquiry or effort to secure a destruction of these bonds. After the trustees had certified to their payment and released the mortgage of record, the matter was left with Hipple and Swartz. Hipple retained bonds to the amount of $48,000, and the others were in the possession of Swartz. On July 1, 1892, and for a long time prior to that date and during the period between this date and that of his death on August 24, 1906, Hipple was president of the defendant company. During all of this period he, as president, was authorized by the defendant to transact its business between the meetings of the board, and in particular to make loans of the trust company's funds to such persons and upon such security as Hipple was pleased to accept. He was trusted to the extent of absolute control over its funds to loan to whom he pleased, and his reports as to the loans he had made, with the collateral, were accepted without question or examination by the board. This entire absence of the board's supervision of Hipple's doings as the trust company's president enabled him during this period to manipulate the accounts and to embezzle over $3,500,000. On the 20th day of November, 1902, in order to continue the concealment of a prior misuse by him of the defendant's money, fraudulently and without knowledge or permission of any officer or person connected with the complainant company, Hipple used the $48,000 of the 1892 bonds in his possession as part collateral for a note of "J. W. Schwartz, a myth or a man of straw," upon which, acting for defendant company, he made a pretended loan, with this collateral attached, and deposited the note in the loan department of the trust company as one of its assets. On December 23, 1904, at an interval between boards, he induced W. H. Whiteside, a clerk of no property, to sign a note for $45,000. Hipple then, without being requested by complainant and without authority from the trust company, as its president certified the remaining $50,000 of bonds in the possession of the trust company as trustee, and without knowledge of either complainant or defendant used them as collateral for the Whiteside note, and as president of the trust company accepted them as a loan and used the proceeds to cover up a previous defalcation of his. Neither of these fraudulent transactions in which the railway company's bonds were used as collateral was known to either the railway company or the trust company until Hipple committed suicide on the 24th day of August, 1906.

It is conceded that as at present viewed in the business world there

is no objection to the president of a trust company becoming financially interested and an officer of other enterprises. Outside of the fact of his connection with these corporations, there is no evidence to support the former receiver of the defendant company's assumption that complainant knew or ought to have known of Hipple's dishonesty, or that the complainant expected to obtain any unlawful advantage from Hipple's connection with the trust company as its president. There is no proof whatever to support the contention that the complainant company, or any of its officers, did anything wrong, or had any knowledge whatever of Hipple's wrongdoing. He was one of the prominent men in banking circles in the city and was trusted by everybody. There was no suspicion whatever of his fraudulent transactions, and both the complainant and the defendant placed implicit confidence in everything he said and did, and it was because he was implicitly trusted that he was enabled to use the railway company's securities, without its knowledge, for the purpose of covering up his embezzlement of the funds of the trust company, but this was done without the knowledge or authority of either. Hipple acted in fraud of both parties. The remedy urged by the complainant in its bill is that the trust company be directed to deliver up the bonds for cancellation because of the fraudulent transfer by Hipple which was made with notice and without consideration.

As to the $48,000, the evidence shows that these bonds had been paid off and never reissued by the railway company. They were left in the possession of Hipple who had been the trustee in the mortgage and was at the time the secretary of the complainant company, but he was without any authority to reissue them. The bonds were regular upon their face and had not yet matured. If, under the circumstances, they had been passed to an innocent third party without notice and for value, it is conceded the complainant would be liable, but if transferred to a party with notice of the fact that they were no longer subsisting obligations of the complainant company, the holder would be estopped from insisting upon their payment. It is true they would pass from hand to hand like a bank note, but they are more like a note drawn to bearer and paid before maturity. Being negotiable, if it should by any neglect of the maker be permitted to pass into the hands of an innocent third party without notice and for value before maturity, there would be a liability on the part of the maker, but in that case, upon proof of the fraudulent use of the note, the burden of proof would be shifted to the holder to establish good faith in the purchase of the same, which involves the proof of a lack of notice and the payment of a valuable consideration. The same would be true in regard to these bonds, being no longer a subsisting obligation. Having clearly established that the transfer to the defendant company was a fraud upon the complainant, the burden is shifted to the defendant to establish that it took these bonds without notice and for a valuable consideration, and, as we have already stated, it has failed to establish either.

There is no evidence whatever to show that the complainant company had knowledge or ought to have had knowledge of Hipple's

irregularities, or that they employed him with a view of "giving a sop to the watchdog" of the defendant, without its knowledge, for the purpose of some financial advantage, and the cases cited in support of a liability on the part of the complainant, under such circumstances, have no application to the facts of this case unless the mere fact of Hipple's financial interest in the complainant company is to be held in law as establishing such a proposition. Nor is there any proof whatever of the fact that any officer or officers in the defendant company were deceived by Hipple in the transfer of the bonds to the defendant company. He acted as the authorized agent of the defendant company in the transfer of these bonds to it. It is not a case where the fraudulent agent, being the agent of both, was on one side of the transaction representing himself in the fraudulent use of the com- plainant's securities without notice to the defendant, and deceiving other officers of the defendant company authorized to act, and in- ducing them to accept these securities, and the cases cited in support of complainant's liability upon such a state of facts have no applica- tion in this case. The facts here bring this within that class of cases in which one principal, the trust company, receives through the inter- vention and the wrongful act of a mutual agent (Hipple) the property of the other principal, the complainant; the mutual agent acting for and in fraud of both. In such case, the party receiving the property of the other is chargeable with a knowledge of the wrong, which was possessed by the mutual agent. Or, to state the proposition shortly, one may not avail himself of the results of his agent's fraud without responsibility for the fraud. Bank v. Munger, 95 Fed. 87, 36 C. C. A. 659; Leather Mfg. Co. v. Morgan, 117 U. S. 96, 6 Sup. Ct. 657, 29 L. Ed. 811; Loring v. Brodie, 134 Mass. 453; Atlantic Mills v. Indian Orchard Mills, 147 Mass. 268, 17 N. E. 496, 9 Am. St. Rep. 698; Atlantic Bank v. Merchants' Bank, 10 Gray (Mass.) 532; Mill- ward-Cliff Cracker Co.'s Estate, 161 Pa. 157, 28 Atl. 1072; Bank v. New Milford, 36 Conn. 93.

The principal found in many of the text-books and in some deci- sions that notice to the agent is not notice to the principal, where the agent is acting in fraud of the principal, must be held to apply to cer- tain wanton torts or wrongs committed by the agent, in which case the principal is relieved. Or, where the mutual agent in the particu- lar case is acting on the one side with other officers of one of his prin- cipals and succeeds in deceiving them, in such case his knowledge could not be held to be the knowledge of the principal deceived; but where, as in this case, the defendant company came into possession of the bonds through Hipple's fraudulent use of the power vested in him, the latter cannot claim to hold the bonds without ratifying the acts and authority of Hipple who transferred them to it. There may be exceptions to the general rule, but each case of this sort depends on its own peculiar facts, as was said in Lyndon Mills Co. v. Lyndon Institution, 63 Vt. 581, 22 Atl. 575, 25 Am. St. Rep. 783.

In the case at bar there is nothing in the conduct of the officers of the trust company as compared with those of the complainant com- pany to entitle the defendant to be exempt from the general rule of

agency. The facts of the case clearly show that the officers of the defendant company were to blame for the result of Hipple's fraudulent transactions, and it should, in this case, stand the loss.

As to the $50,000 of bonds, we find as a fact that they were placed in the possession of the defendant company to be certified when called for, and although they were left in the possession of the defendant company after the mortgage had been satisfied, they were not a perfected obligation of the complainant company which could have been sold without the defendant's certificate. This certificate was executed on the part of the defendant fraudulently, of course, by its own president, and as a result of this fraudulent execution of the certificates, the bonds became, upon their face, a valid, subsisting, negotiable obligation, and, in the hands of third parties, would have been valid against the complainant company, but, even in that case, the complainant company would have had a right of action against the defendant for a fraudulent and illegal certification of these bonds, and the latter could not have pleaded the fraudulent act of its president. It would have been bound to answer in damages.

The defendant's right to retain this $50,000 of bonds has much less merit in it than in its claim to the $48,000, because these bonds were not a subsisting, negotiable obligation left in the hands of Hipple, they were bonds not legally completed as an obligation of the complainant company and left in the possession of the defendant. The defendant, through its negligence, permitted its president to certify and to perfect these obligations as an unmatured, subsisting, negotiable obligation of the complainant, and then, through the same negligence, permitted him (its president) to assign them to it as collateral security to cover a former embezzlement. It was fraudulently made to perfect these obligations through its agent acting for it, and by his further fraud it came into their possession. Under the authorities above stated, it is bound by his knowledge of their fraudulent certification and their fraudulent use.

The prayer of the complainant in its bill for a decree requiring the defendant company to deliver up these obligations for cancellation should be granted. Counsel is requested to draw a decree in accordance with this opinion and submit to the court.