399 A.2d 1088

**Thomas A. SCOTT, Appellant,**

v.

**Robert PURCELL and the Oaklander Associates, a
Limited Partnership.**

Superior Court of Pennsylvania.

Submitted April 10, 1978.

Decided March 16, 1979.

Petition for Allowance of Appeal Granted Aug. 23, 1979.

James L. McAneny, of McCrady, Nicklas & McCrady, Pittsburgh, for appellant.

David J. Humphreys, of Hess & Humphreys, Pittsburgh, for appellees.

Before JACOBS, President Judge, and HOFFMAN, CERCONE, PRICE, VAN der VOORT, SPAETH and HESTER, JJ.

SPAETH, Judge:

This is an appeal from the refusal to take off orders of compulsory nonsuit.

In reviewing the propriety of the orders, we must apply the rule stated in *Shechter v. Shechter,* 366 Pa. 30, 33, 76 A.2d 753, 755 (1950), where the Supreme Court said that a nonsuit "should only be entered in a clear case where the plaintiff cannot recover under any view of the evidence with every doubt resolved against its entry and all inferences drawn most favorably to the plaintiff. As a general rule unless there are no conflicting inferences to be drawn it is far better to hear the defense so that the appellate court may have the benefit of findings of fact and conclusions of law by the chancellor confirmed by the court en banc." (citations omitted) *See also Schwartz v. Urban Redevelopment Auth. of Pittsburgh,* 411 Pa. 530, 192 A.2d 371 (1963); *McAuliffe v. Constantine,* 228 Pa.Super. 52, 323 A.2d 158 (1974). Read in this light the testimony may be summarized as follows. In considering this summary, one should bear in mind that it states only appellant's evidence; had appellees' evidence been heard, the case might appear to be very different.

Appellant owned a piece of land in the Oakland section of Pittsburgh, on which was located the Civic Center Motor-Hotel. Appellant leased space in the Motor-Hotel to others, and himself operated a restaurant there. During the summer of 1970, appellant learned that his land was to be taken by eminent domain, and that he would have to move out of his restaurant at the end of September 1971. Record at

159a. As a consequence, appellant began to inquire into the possibility of buying other land in the Oakland section. Sometime during the late fall of 1970, in his office in the Motor-Hotel, appellant met appellee Purcell, who was involved in real estate development in the Oakland section, and who had previously tried to interest appellant in a number of properties there. Appellant asked Purcell about financing the building of a new Motor-Hotel. When Purcell indicated that he could get financing, appellant proposed that Purcell become involved as a 50% owner of the new Motor-Hotel; appellant stated various terms, notably that he would have full management of the new Motor-Hotel and could operate a restaurant there on a $1 a year lease. Record at 75a–77a. Appellant testified that Purcell was "agreeable" to these terms. Record at 77a.

Appellant and Purcell proceeded by automobile to a piece of property located at 3454 Forbes Street in the Oakland section. Record at 78a. Appellant told Purcell that he had previously been interested in this property, but that the asking price of $350,000 had been too high. Record at 81a. Appellant explained that the owner was one Mrs. Ferguson, Record at 79a, who lived in Florida, Record at 90a. Back in appellant's office, appellant asked Purcell to visit Mrs. Ferguson, while he was on vacation in Florida, and find out how much she wanted for the property. Record at 90a. Appellant testified that Purcell agreed that he would see her and that any agreement would be between her and appellant. Record at 90a.

Two witnesses corroborated appellant's testimony. Anthony Schulli, manager of the Motor-Hotel restaurant, testified that appellant called him into the meeting, and that he heard appellant say that "[h]e [Purcell] was supposed to secure the piece of property for [appellant], and Mr. Purcell said he would." Record at 192a. Alfred H. Cicerto, appellant's accountant, testified that he heard appellant ask Purcell "to be his agent to secure that property [Ferguson property] and he told him where to find Mrs. Ferguson in Florida," Record at 210a, and that Purcell responded affirmatively, Record at 211a.

After this meeting, several other meetings occurred. Record at 99a. Appellant and Purcell had meetings with one Mr. Patterson, who was associated with Ramada Inn, Inc., at which financing the new Motor-Hotel was discussed. Sometime in February 1971, Purcell visited Mrs. Ferguson in Florida and called appellant and told him that she wanted approximately $250,000 for the property. Record at 80a. Appellant instructed Purcell to make a counter offer of $10,000 prior to closing and $225,000 at closing. Record at 80a. Purcell called appellant back and told him that Mrs. Ferguson would accept his offer. Record at 83a. When Purcell returned from Florida, he met with appellant at least once and possibly twice. Record at 109a. The substance of appellant's testimony as to what occurred was that he said he would give Purcell a check for $10,000 for Mrs. Ferguson as soon as an agreement of sale was prepared. Record 109a. Apparently, appellant instructed Purcell to discuss the preparation of an agreement with Mrs. Ferguson's attorney and to have the attorney deliver the agreement with the space for the buyer's name left blank. Record at 110a. Appellant insisted several times on cross-examination that he did not want Purcell to disclose his name as the buyer until he had signed the agreement. Record at 148a, 149a, 162a, 178a, 186a. There is some confusion on this point, for while appellant testified that he wanted his identity kept secret until "the time of closing," Record at 162a, on redirect examination he said that by this he meant, at the time of the delivery of the agreement and payment of the initial $10,000. Record at 186a. In any case, although Purcell promised to bring around some papers "on a Tuesday," he never came with the agreement or picked up the $10,000. Record at 85a. Appellant's efforts to telephone Purcell were not successful. Record at 85a.

Sometime after April 2, appellant received in the mail an agreement between Mrs. Ferguson and Lancer Development Corporation. Record at 101a. He testified that it had a "place" for his signature, but he ignored it, because "I wasn't doing business with that corporation, it doesn't mean

nothing to me." Record at 130a.[1] On April 16 Purcell's wife, Marnie E. Purcell, signed the agreement on behalf of Lancer Development Corporation. Purcell was President of Lancer Development Corporation, his attorney was secretary, and his wife was assistant secretary and 100% stockholder. Record at 38a.

Meanwhile, appellant had succeeded in telephoning Purcell and a meeting between appellant, Purcell, and appellant's attorney, John Nicklas, was set up for April 23. At this meeting, appellant and Nicklas were shown the April 16 agreement by Purcell; appellant was "upset about it." Record at 91a. However, when Purcell "indicated there was no reason to be concerned because it [the deal] still could be carried on as we had originally agreed," Record at 91a, the meeting continued with an explanation of the financing arrangements, for the benefit of Nicklas. Record at 92a, 93a. At the conclusion of the meeting, Purcell agreed to do additional work on the financing arrangements. Record at 94a. Nicklas corroborated appellant's version of the meeting. Record at 293a, 294a. Not long after the meeting, appellant received a letter from Purcell dated April 26 in which Purcell stated that he was having difficulty getting financing for the project. Record at 102a, 103a. Appellant tried to telephone Purcell, and continued to try to telephone him over the next few months, but was not successful. Record at 179a.

On August 19, 1971, a deed from Margaret Ferguson to Oaklander Associates, a limited partnership, was recorded. Called as on cross-examination, Purcell testified that Oaklander Associates was formed two or three months after the April 16 agreement of sale, as a limited partnership consisting of Oaklander Corporation as general partner and Mr. and Mrs. Dunbar as limited partners. Record at 37a. He also testified that he was vice-president of Oaklander Corporation and that his wife and the Dunbars were the share-

1. We have not been able to find a copy of this agreement in the record, even though it was introduced as plaintiff's exhibit 3. Record at 101a.

holders. Record at 35a, 36a. He did not say when Oaklander Corporation was formed. He was not asked nor did he indicate when or how the interest of Lancer Development Corporation in the Ferguson property had been transferred to Oaklander Associates.

The lower court wrote an extensive opinion in support of its refusal to take off its orders of nonsuit. With respect to Purcell, the court held that a nonsuit was proper because appellant had not proved a contract between himself and Purcell, and, therefore, no breach had occurred. Slip opinion at 9. The court did not deal with the question of whether a constructive trust should be imposed on the Ferguson property, although it acknowledged that this was the theory upon which appellant was proceeding. Slip opinion at 9. With respect to Oaklander Associates, the court held that a nonsuit was proper because, with no liability attaching to Purcell, there was no basis for a cause of action against Oaklander Associates. Slip opinion at 9.

■ The central issue, however, is whether, when the evidence is viewed in the light most favorable to appellant, *Schechter v. Schechter, supra,* enough appears to warrant the imposition of a constructive trust on the Ferguson property.[2]

■■ The Supreme Court has said that a constructive trust "is not really a trust at all but rather an equitable remedy." *Buchanan v. Brentwood Federal Savings and Loan Ass'n,* 457 Pa. 135, 151, 320 A.2d 117, 126 (1974); *See also Kimball v. Barr Township,* 249 Pa.Super. 420, 378 A.2d 366 (1977). As such, it " 'is the formula through which the

2. Although claiming that appellees should be declared constructive trustees of the Ferguson property, appellant does not seek, for example, a transfer of the property, but only money damages. Arguably, therefore, appellant has conceded that he had an adequate remedy at law. Pa.R.Civ.P. 1509 stated: "The objection of the existence of a full, complete and adequate non-statutory remedy at law shall be raised by preliminary objection. If the objection is sustained, the court shall certify the action to the law side of the court. If not so pleaded, the objection is waived." Appellees did not raise such a preliminary objection. The case was therefore properly before the lower court sitting in equity.

conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.' " *Buchanan v. Brentwood Federal Savings and Loan Ass'n, supra,* 457 Pa. at 152, 320 A.2d at 127. A constructive trust may arise "even though the acquisition of property was not wrongful and the defendant's intention was not malign. Our courts focus not on intention, but on the result of unjust enrichment." *Kimball v. Barr Township, supra* 249 Pa.Super. at 425, 378 A.2d at 368–369. Since "[t]here is no rigid standard for determining whether the facts of a particular case require a court of equity to impose a constructive trust," *Kimball v. Barr Township, supra,* 249 Pa.Super. at 425, 378 A.2d at 369, it is "rare" that this "can be decided as a matter of law." *Buchanan v. Brentwood Federal Savings and Loan Ass'n, supra* 457 Pa. at 152, 320 A.2d at 127.

In the case before us, appellant tried to "convince the conscience of equity," *Buchanan v. Brentwood Federal Savings and Loan, supra,* 457 Pa. at 153, 320 A.2d at 127, by showing that Purcell agreed to act as his agent in negotiating the purchase of the Ferguson property, but instead in violation of his duties gave Lancer Development Corporation, and through it, Oaklander Associates, the opportunity to purchase the property. If convinced of this, it is clear that the lower court could have imposed a constructive trust. In *Shannon v. Baltz,* 398 Pa. 431, 158 A.2d 558 (1960), the Supreme Court was confronted by a situation in which a real estate broker had been employed by a group of landowners to negotiate an offer to purchase some land, but had instead purchased it himself. In spite of the fact that the broker got no response from the landowners to his subsequent offer to assign his ownership rights to them, Mr. Justice BOK found it "hard to imagine a case more clearly in violation of the legal adage that unless otherwise agreed upon an agent is duty bound not to compete with his principal over the subject matter of the agency." 398 Pa. at 433, 158 A.2d at 560. He went on to say: "A real estate broker engaged to

negotiate an offer to purchase a specific piece of ground has more to do than sit by and watch his clients procrastinate: it is in his charge to forward the thing he agreed to do. Baltz did nothing, so far as we can see, but talk and watch, until the chance came to snap up the property for himself." 398 Pa. at 434–435, 158 A.2d at 560.

■ With all inferences drawn most favorably to appellant, the record reveals an abuse of agency as egregious as the one described in *Shannon v. Baltz, supra.* The basic elements of agency are "the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking." *Restatement, (Second) of Agency,* § 1(1) (1958) (Comment). From the outset, these elements were present. There was substantial evidence that appellant asked Purcell to visit Mrs. Ferguson in Florida and negotiate an offer to buy her property on appellant's behalf. Record at 90a. Purcell agreed to see her and promised appellant that any agreement of sale would be between her and him. Record at 90a. Two witnesses confirmed appellant's version of the understanding between the parties. Record at 192a, 211a.

Furthermore, Purcell's activities in Florida in February 1971 strongly suggest that he was acting as appellant's agent for the purchase of the property. Appellant testified that Purcell called him and related what price Mrs. Ferguson wanted; that he instructed Purcell to make a counteroffer; and finally, that Purcell called him back and said that she would accept it. Record at 80a, 83a.

■ Nor is there any compelling evidence that the initial relationship between Purcell and appellant was modified or terminated before Purcell abused it. A modification of an agency relationship may occur where a principal acquiesces in conduct not included in the original authorization. *See Restatement (Second) of Agency, supra,* §§ 43, 94. The Comment to Section 43 adds: "Persons ordinarily express dissent to acts done on their behalf which they have

not authorized or of which they do not approve." *Restatement (Second) of Agency, supra,* at 133. Here, it is true that when appellant received a copy of the proposed agreement between Mrs. Ferguson and Lancer Development Corporation in early April, he did not at once express his dissatisfaction to Purcell. This inaction, however can be explained by appellant's total lack of recognition of this corporation, Record at 130a and by his inability to reach Purcell by telephone to discuss the matter. Record at 85a. When appellant learned at the April 23 meeting that on April 16 Mrs. Ferguson and Lancer had come to an agreement, he was "upset about it." Record at 91a. The fact that he continued discussions with Purcell does not indicate acquiescence in Purcell's violation of his duties as appellant's agent, for Purcell assured him that despite the Lancer purchase, "it [the deal] still could be carried on as we had originally agreed." Record at 91a, 92a, 93a. Similarly, appellant's actions did not constitute a termination of Purcell's agency. The general comment to the Restatement's section on termination of agency states that "Authority and apparent authority are in general interpreted as is a contract; that is, in accordance with what the agent . . . reasonably believes from what the principal has said or done." *Restatement (Second) of Agency, supra,* at 274. Thus to terminate an agency, there must be either a lapse of time, accomplishment of the anticipated results, external changes in the relationship (*e. g.,* death of parties, changes in business conditions), or mutual consent, revocation, or renunciation. *Restatement (Second) Agency, supra,* §§ 105, 124. Here, given the complexity of the transaction, there was no such lapse of time as would warrant as reasonable the conclusion that Purcell's agency had terminated. In this regard appellant's testimony of his efforts to telephone Purcell may be noted; interpreted in appellant's favor, this supports an inference that Purcell was trying, successfully, to avoid appellant while he abused his agency by negotiating with Mrs. Ferguson not on appellant's behalf but Lancer's. Nor may it be reasonably concluded that Purcell's agency was terminated by renunciation. As an initial proposition it

might be maintained that Purcell's presentation at the April 23 meeting of the April 16 agreement between Mrs. Ferguson and Lancer, as a *fait accompli,* represented a renunciation; but any such effect was undone by Purcell's assurance that "[the deal] still could be carried on." In any event, Purcell's abuse of his agency had already occurred, with his negotiation of the April 16 agreement.[3]

Although Oaklander Associates' liability in this case turns on different facts than Purcell's, we also believe that the lower court erred in granting a nonsuit as to it. We are not convinced that Oaklander Associates should be held to have "impliedly ratified the acts of Purcell," as appellant's brief suggests. However, we agree with appellant that when the evidence is viewed in the light most favorable to him, it appears that Oaklander Associates was unjustly enriched by being given the opportunity to buy the Ferguson property.

Appellant's ratification argument is that Oaklander Associates should be held to have the knowledge of Purcell, who was vice-president of Oaklander Corporation, which was

3. The fact that Purcell is not the present owner of the Ferguson property does not relieve him of liability as a constructive trustee. In *Kimball v. Barr, supra,* 249 Pa.Super. at 427, 378 A.2d at 370 n. 3, Judge HOFFMAN wrote: "Although appellant alleges that he no longer possesses the funds provided by Barnes and Tucker, this does not prevent us from impressing a constructive trust on appellant. If appellee is to be successful in holding appellant liable as a constructive trustee, it must establish that a *res* exists or existed upon which a constructive trust can be impressed. See Restatement of Restitution § 160 (1937). However, if appellant held property at any point in time which properly can be decreed the subject of a constructive trust, the mere fact that he does not now hold such property will not preclude the imposition of personal liability upon it for the improper disposition of such property." Although the present case is distinguishable from *Kimball,* in that Purcell never owned the Ferguson property, we believe that the distinction is immaterial, given the influence Purcell had over the corporation that signed the agreement of sale and the partnership that ultimately took title. Record at 35a, 36a, 37a, 38a. When the evidence is viewed in the light most favorable to appellant, it may be inferred that these organizations were created to function as alter egos for Purcell. *See generally* Cary, *Corporations, Cases and Materials,* 109–150 (Fourth Edition 1969).

general partner of Oaklander Associates.[4]   Appellant cites *Washington, A. and Mt. Vernon Ry. Co. v. Real Estate Trust Co. of Philadelphia,* 177 F. 306 (3rd Cir., 1910), *modified Real Estate Trust Co. of Phila. v. Washington, A. and Mt. Vernon Ry. Co.,* 191 F. 566, *cert. denied, Washington, A. and Mt. V. Ry. Co. v. Real Estate Trust Co. of Phila.,* 223 U.S. 724, 32 S.Ct. 525, 56 L.Ed. 631 (1911), in support of the proposition that "where the principal acquired possession of bonds through the agent's fraud,  .   .   .  the principal could not hold the bonds and derive the benefit of the agent's fraud without ratifying the acts and authority of the agent who transferred them."   Appellant's Brief at 15.

▮   Although appellant has accurately stated *Washington A. and Mt. Vernon Ry. Co.,* that case is readily distinguishable from the case before us.   There, the agent acquired benefits for the principal though the "fraudulent use of the power vested in him."   177 F. at 312.   Here, appellant made no showing that Purcell's acts were pursuant to authority given to him by Oaklander Corporation, let alone, Oaklander Associates.   As has been mentioned, there was no testimony as to when Oaklander Corporation was created;  the only testimony regarding the creation of Oaklander Associates is Purcell's, that it was formed two or three months after the April 16 agreement of sale was signed.   Record at 37a.   In *Houseman v. Girard Mutual B and L Association,* 81 Pa. 256, 262 (1876), Mr. Justice SHARSWOOD stated: "[I]t is equally well settled that the principal is only to be affected by knowledge acquired in the course of the business in which agent was employed .   . . [T]he true reason of the limitation is a technical one, that it is only during the agency that the agent represents, and

4.   The *Restatement (Second) of Agency* § 98 makes it clear that even where the principal receives the benefit of an agent's unauthorized acts, the principal must have knowledge of those acts, in order to ratify them.   The Comment to Section 98 states: "The receipt of benefits by the purported principal without knowledge of the transaction between the purported agent and the third person or *without knowledge of other material facts* does not constitute affirmance, unless the principal assumes the risk of his lack of knowledge." (Emphasis added.)   *Restatement (Second) of Agency, supra,* at 253.

stands in the shoes of his principal. Notice to him twenty-four hours before the relation commenced is no more notice than twenty-four hours after it had ceased would be." *See also Gilkeson v. Thompson*, 210 Pa. 355, 59 A. 1114 (1904); *Chester v. Schaffer*, 24 Pa.Super. 162, 9 A. 520 (1904).

The case is otherwise with respect to unjust enrichment. In *Buchanan v. Brentwood Federal Savings and Loan Association, supra*, the Supreme Court stated that the imposition of a constructive trust on the property in question would be proper if the appellants were able to show on remand that the appellees had been unjustly enriched; such a showing would amount to "a general assertion that the ends of public policy and substantial justice demand that a constructive trust be impressed." *Buchanan v. Brentwood Federal Savings and Loan Association, supra* 457 Pa. at 155, 320 A.2d at 128. Recently, we said that to sustain a claim of unjust enrichment, "appellant must show that she wrongfully secured or passively received a benefit that it would be unconscionable for her to retain." *Roman Mosaic and Tile Co., Inc. v. Vollrath*, 226 Pa.Super. 215, 218, 313 A.2d 305, 307 (1973); *See generally Moreland v. Metrovich*, 249 Pa.Super. 88, 375 A.2d 772 (1977); *Kimball v. Barr Township, supra; Restatement of Restitution* §§ 160, 194 (1937). Here, appellant has made no showing that Oaklander Associates "wrongfully secured" the property in question, but he has shown that it "passively received a benefit that it would be unconscionable for [it] to retain." The fact that Oaklander Associates may not on the present record be held to have known of Purcell's wrongful acts does not refute the basic point that it was given a chance to buy the property, only because Purcell violated his duties to appellant as appellant's agent.

In remanding for a new trial, we believe some additional comment, on certain matters, may be helpful. First: The trial judge did not permit the recall of Purcell for further cross-examination. We have said that "[i]t is within the sound discretion of the trial judge to determine whether or not a witness can be recalled." *Commonwealth v. Luci-*

368

*ano,* 205 Pa.Super. 397, 402, 208 A.2d 881, 884 (1965); *see also Engle v. Capitol F. Ins. Co., Concord,* 75 Pa.Super. 390 (1921). Our reading of the record suggests that the lower court may not have realized that it had this discretion. Second: The lower court severely restricted Nicklas's testimony as to the April 23 meeting, in spite of appellant's desire to use this testimony to rebut Purcell's version of the meeting. This was error. In *Gougher v. Hansler,* 388 Pa. 160, 166, 130 A.2d 150, 153 (1957), the Supreme Court said: "[I]n the case of a party to the proceeding, a prior statement by him inconsistent with his claim or testimony at trial, while it too has the effect of impeaching his credibility, is also admissible as an admission against interest and, as such, constitutes substantive proof of the truth of the matter therein contained." Finally: A constructive trust may be proved by the testimony of only one witness. *See Blick v. Cockins,* 234 Pa. 261, 273, 83 A. 196, 200 (1912).

Reversed and remanded for new trial.

JACOBS, former President Judge, HESTER and HOFF-MAN, JJ., did not participate in the consideration or decision in this case.