# FDA Packaging Inc. v. Advance Personnel Staffing Inc.

*Michael D. Kristofco,* for plaintiff.
*Kevin A. Moore,* for defendant.

LASH, *J.,* June 1, 2005—The matter before this court is the emergency petition of plaintiff, FDA Packaging Inc., to stay arbitration proceedings pursuant to FDA's declaratory judgment action. Defendant, Advance Personnel Staffing Inc., has moved for arbitration, seeking damages from FDA for breach of contract for failure to make payments when due. Our determination on whether to stay the arbitration rests on whether FDA is bound by an agreement executed on FDA's behalf by FDA's office manager, as the agreement contains an arbitration provision requiring that all controversies or disputes between the parties be resolved by arbitration. For reasons set forth herein, this court denies FDA's emergency petition for stay of arbitration and dismisses the declaratory judgment action.

On or about November 8, 2001, the parties entered into a contract entitled, "New account and identification agreement" (first agreement), which provided that Advance would supply temporary employees for FDA in exchange for payment for services rendered by the temporary employees. The agreement was little more than an outline of the parties' responsibilities, and contained no arbitration provision.

The parties worked together under the first agreement. Over time, Advance was called upon to supply an increasing number of employees for FDA. Accordingly, Advance sought a new agreement to protect its status as a primary staffer, holding discussions with J. Brian

McHugh, the president of FDA. Understanding that an agreement was reached, Advance prepared and submitted a writing entitled, "Primary staffing vendor agreement" (second agreement), setting forth that Advance would provide to FDA all necessary temporary employees for certain enumerated jobs, and that Advance Personnel would be the primary vendor provider of assigned employees. The second agreement was executed on April 16, 2003, by Rose Marie Larson on behalf of Advance and Deborah Dierolf, FDA's office manager, on behalf of FDA.

The second agreement contains the following arbitration provision:

"Remedies

"(44) Arbitration

"(a) Any controversy or dispute between the parties, whether arising out of or in connection with this Agreement or otherwise, shall be resolved in an arbitration under the Federal Arbitration Act and before the American Arbitration Association in accordance with AAA's then obtaining Commercial Arbitration Rules at the AAA location closest to Advance Personnel's office. The administrative cost of the arbitration and the arbitrator's fee shall be shared equally by the parties.

"(b) In such arbitration, the arbitrator shall have no authority or power to amend, modify, or in any other way change any of the terms of this agreement. All decisions of such arbitrator shall be final and binding upon both parties. The prevailing party in such arbitration as determined by the arbitrator in his or her decision shall be awarded an amount equal to its reasonable attorney's

fees incurred in connection with such arbitration, in addition to what other relief may be awarded.

"(c) Judgment upon any award rendered by the arbitrator may be entered in any court having jurisdiction thereof."

According to Advance, FDA fell behind on its payments. Eventually, in late 2004, Advance removed its employees from the FDA plant. On or about November 19, 2004, Advance commenced an arbitration proceeding with the American Arbitration Association, seeking monies owed by FDA of approximately $183,000. According to Advance, FDA did not respond to the arbitration demand, nor to correspondence sent to FDA from AAA dated December 3, 2004, giving FDA until December 17, 2004, to file an answer to the complaint.

An arbitrator was appointed and preliminary matters scheduled. FDA responded by objecting to the arbitration proceeding. On April 22, 2005, the arbitrator ruled on jurisdiction, stating the following:

"American Arbitration Association

"Order no.

"Case no. 14 181 02243 04

"Order on Jurisdiction To Determine Arbitrability of This Dispute

"Pursuant to the preliminary hearing and scheduling order dated March 30, 2005, in the above-referenced case, respondent filed an objection to arbitration and, in the alternative, answering statement on April 8, 2005. Claimant filed its reply to respondent's objection to arbitration on April 15, 2005.

"Pursuant to the Commercial Arbitration Rules, specifically R-7, the arbitrator has the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement. Further, a party must object to the jurisdiction of the arbitrator or the arbitrability of a claim no later than the filing of an answering statement to the claim.

"This case was filed by claimant on or about November 23, 2004. By letter dated December 3, 2004, AAA gave respondent the opportunity to file an answer to the complaint on or before December 17, 2004. Respondent did not file an answer and did not file an objection to the arbitrability of the claim or the jurisdiction of the arbitrator on or before December 17, 2004. Accordingly, I find that respondent has waived its right to challenge the arbitrability of these proceedings. This case shall proceed in accordance with the preliminary hearing and scheduling order.

"Dated April 22, 2005

"/s/Judy Weintraub, Arbitrator"

On April 16, 2005, FDA filed the within complaint for declaratory judgment requesting that this court temporarily and permanently stay the arbitration initiated by Advance and declare that the second agreement was, in whole or in part, null and void. Further, due to the pendency of the arbitration hearing, FDA filed, on April 21, 2005, an emergency petition to stay the arbitration. Argument on the emergency petition was scheduled by the Honorable Albert A. Stallone, senior judge, for May 16, 2005. The arbitration hearing was stayed, pending

further order of court. Further, on motion of Advance to conduct discovery, Senior Judge Stallone ordered that depositions be taken on disputed issues of fact.

The parties conducted depositions to produce evidence on the issue of whether Deborah Dierolf was authorized to execute the second agreement on behalf of FDA. Depositions were made part of the record and argument was held on May 16, 2005.

Preliminarily, we must decide whether the arbitration question is within our purview. The arbitrator determined otherwise, ruling she had the power to rule on her own jurisdiction. The arbitrator relied upon Rule R-7 of the Commercial Arbitration Rules, which states:

"*R-7. Jurisdiction*

"(a) The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.

"(b) The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

"(c) A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award."

The arbitrator went on to find that, pursuant to R-7(c), FDA had waived its rights to challenge the arbitrability of the proceedings by failing to respond or object to the arbitrability of the claim on or before December 17, 2004.[1]

FDA claims that this court, not the arbitrator, must decide jurisdiction, relying on section 7304(b) of the Uniform Arbitration Act,[2] which sets forth:

"(b) *Stay of arbitration.*—On application of a party to a court to stay an arbitration proceeding threatened or commenced, the court may stay an arbitration on a showing that there is no agreement to arbitrate. When in substantial and bona fide dispute, such an issue shall be forthwith and summarily tried and determined, and a stay of the arbitration proceedings shall be ordered if the court finds for the moving party. If the court finds for the opposing party, the court shall order the parties to proceed with arbitration."

In the case of *Ross Development Co. v. Advanced Building Development Inc.,* 803 A.2d 194, 196-97 (Pa. Super. 2002), the Superior Court, construing section 7304(b), states:

"In a proceeding to stay or to compel arbitration, the question of whether the parties agreed to arbitrate, commonly referred to as 'substantive arbitrability,' is generally one for the courts and not for the arbitrators. *AT & T Technologies Inc. v. Communications Workers of Am.,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648

---

1. As FDA filed no answer, the last day to object would be the last day permitted for filing, December 17, 2004.

2. 42 Pa.C.S. §7304(b).

(1986). On the other hand, resolution of procedural questions, including whether the invocation of arbitration was proper or timely, is left to the arbitrator. *Mack Mfg. Corp. v. International Union, United Auto., Aircraft and Agric. Implement Workers Local 677,* 368 Pa. 37, 81 A.2d 562 (1951). Such questions may be referred to as 'procedural arbitrability.'

"In Pennsylvania, our Supreme Court has held that:

"When one party to an agreement to arbitrate seeks to enjoin the other from proceeding to arbitration, judicial inquiry is limited to the question of whether an agreement to arbitrate was entered into and whether the dispute falls within the scope of the arbitration provision. (citation omitted) Thus, a party who can establish that he did not agree to arbitrate, or that the agreement to arbitrate, limited in scope, did not embrace the disputes in issue, may be entitled to enjoin an arbitration proceedings [sic].

"*Kardon v. Portare,* 466 Pa. 306, 309-10, 353 A.2d 368, 369 (1976) (quoting *Flightways Corp. v. Keystone Helicopter Corp.,* 459 Pa. 660, 331 A.2d 184, 185 (1975)); see also, *Paone v. Dean Witter Reynolds Inc.,* 789 A.2d 221 (Pa. Super. 2001) (holding same). Again, the question of substantive arbitration is for the courts while procedural arbitration is left to the arbitrators."

As the arbitration provision sets forth that the arbitration proceedings are to be conducted under the Federal Arbitration Act, this court sought guidance from the federal court to consider the issue of jurisdiction within the context of the FAA. The case of *Bertram v. Beneficial Consumer Discount Company,* 286 F. Supp.2d 453, 457-

58 (M.D. Pa. 2003), provides a thorough and extensive analysis:

"The FAA, which provides a framework for the implementation and enforcement of private arbitration agreements, establishes a strong presumption in favor of arbitration over litigation. [*Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 106 (3d Cir. 2000).] Even in circumstances in which the validity of the contract is in dispute, the statute mandates courts to reserve these issues for the arbitrator. 9 U.S.C. §2; *Sandvik*, 220 F.3d at 104. The FAA provides that, when the court is 'satisfied that the making of the [arbitration clause] . . . is not in issue,' it '*shall* . . . stay the trial of the action' pending arbitration. 9 U.S.C. §§2-4 (emphasis added); see also, *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). Phrasing this requirement in the negative, the court may decline to enforce an arbitration clause only when the making of the clause itself, not merely the making of the contract as a whole, is disputed. See *id.*

"Thus, for purposes of determining the enforceability of an arbitration clause, the FAA requires the court conceptually to sever the arbitration provisions from the remainder of the contract. See *Sandvik*, 220 F.3d at 106. Under this principle, deemed the doctrine of severability, courts analyze arbitration clauses as individual agreements, executed concurrently with, but not as part of, the encompassing contract. See *id.* Application of this doctrine means, somewhat anomalously, that a prima facie finding that a contract is voidable does not render an embedded arbitration clause voidable or unenforceable. *Id.* Rather, as stated in the FAA, only when the

making of the clause itself is in issue is the arbitration provision rendered ineffective. 9 U.S.C. §§2-4; *Prima Paint,* 388 U.S. at 403-404, 87 S.Ct. 1801. Thus, to avoid arbitration under the FAA, the challenging party must establish grounds for declaring a contract voidable that relate specifically to the arbitration clause, viewed independently from the remainder of the contract. *Sandvik,* 220 F.3d at 106.

"Although the severability doctrine requires enforcement of an arbitration agreement embedded in an otherwise voidable contract, it does not permit enforcement when the encompassing contract is considered void ab initio. *Id.;* see also, *China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.,* 334 F.3d 274, 282 (3d Cir. 2003). The reasons for this disjunction lies in the distinction between voidable and void contracts. A voidable contract is one in which a party has the power, 'by a manifestation of election to do so,' either to disaffirm the agreement, avoiding the legal duties imposed by it, or to ratify the agreement, mandating performance of the contractual obligations by both parties.[3] Restatement (Second) of Contracts §7 (1981), cited in *Sandvik,* 220 F.3d at 107. A claim that a contract is voidable does not challenge the existence or prima facie validity of the underlying agreement, but charges that inequitable conduct associated with the formation or performance of the agreement renders it unenforceable at the election of the aggrieved party. See *id.; Sandvik,* 220 F.3d at 107-109.

---

3. Voidable contracts often arise in circumstances in which the contract is tainted by unconscionability, duress, misrepresentation, fraud, or other bad faith conduct. See *e.g.,* Restatement (Second) of Contracts §7 (1981).

Such a claim does not implicate the making of the arbitration clause itself, and, thus, the FAA requires the court to enforce an embedded arbitration agreement in these circumstances. See *id.*

"In contrast, a declaration that a contract is void nullifies all aspects of the agreement, including an embedded arbitration clause, giving neither party the power to rectify or disaffirm its provisions.[4] Restatement (Second) of Contracts §7 cmt.a ('[A void contract] is not a contract at all.'); *Sandvik,* 220 F.3d at 107-109. Essential to this concept is the principle that a void contract lacks legal existence from inception, and that the subsequent judicial declaration merely clarifies, rather than alters, the legal relationship of the parties. See *id.* Because arguments that a contract is void ab initio threaten the existence of all provisions of the agreement, including an embedded arbitration clause, such a claim necessarily puts the making of the arbitration clause in issue, rendering resolution of the claim improper for arbitration under the FAA. *Id.;* see 9 U.S.C. §§2-4.

"Thus, the FAA mandates enforcement of arbitration provisions in all but two circumstances: (1) when a party alleges that the contract as a whole is void ab initio for any reason, or (2) when a party alleges that the arbitration clause itself is voidable for reasons related specifically to the arbitration clause. In all other situations, the FAA requires the court to enforce the terms of the clause and to refer the matter to arbitration."

---

4. Void contracts generally arise in cases of forgery of a party's name or unauthorized execution of an agreement on behalf of another party. See *e.g.,* Restatement (Second) of Contracts §7 cmt. a.

FDA seeks to establish that execution of the second agreement was unauthorized. If so, the agreement and the arbitration provision contained within would be void ab initio. Thus, it is for this court to determine whether FDA's position has merit.[5]

Upon review of the record, this court finds that FDA is bound by the terms of the arbitration agreement and therefore this matter should proceed to arbitration. This holding stems from our finding that Brian McHugh, president of FDA, authorized Deborah Dierolf to act as the agent of FDA and to execute documents on its behalf.

In the case of *Volunteer Fire Company of New Buffalo v. Hilltop Oil Co.,* 412 Pa. Super. 140, 146-47, 602 A.2d 1348, 1351-52 (1992), the Superior Court provides a good overview of the law of agency:

"Agency 'cannot be assumed from the mere fact that one does an act for another.' *Bross v. Varner,* 159 Pa. Super. 495, 497, 48 A.2d 880, 881 (1946). Whether an agency relationship exists is a question of fact. *Bolus v. United Penn Bank,* 363 Pa. Super. 247, 259, 525 A.2d 1215, 1221 (1987), *allocatur denied,* 518 Pa. 627, 541 A.2d 1138 (1988). The party asserting an agency relationship has the burden of proving it by a fair preponderance of the evidence. *Apex Financial Corp. v. Decker,* 245 Pa. Super. 439, 443, 369 A.2d 483, 485 (1976). Agency is created where there exists a 'manifestation by

_____

5. For the record, we also note that the arbitrator never ruled on this very issue, relying instead on FDA's failure to object as a basis for waiver under R-7(c). However, FDA cannot be subject to R-7(c) or any of the AAA rules if it is not subject to the arbitration provision itself. Assuming jurisdiction, the arbitrator should have first ruled on the validity of the contract before determining whether FDA had waived its right to object.

the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking.' *Scott v. Purcell,* 264 Pa. Super 354, 363, 399 A.2d 1088, 1093 (1979), citing Restatement (Second) of Agency §1(1) (1958) (Comment). Before a fact-finder can conclude that an agency relationship exists and that the principal is bound by a particular act of the agent, the fact-finder must determine that one of the following exists:

"(1) express authority directly granted by the principal to bind the principal as to certain matters; or

"(2) implied authority to bind the principal to those acts of the agent that are necessary, proper and usual in the exercise of the agent's express authority; or

"(3) apparent authority, *i.e.* authority that the principal has by words or conduct held the alleged agent out as having; or

"(4) authority that the principal is estopped to deny.

"*Bolus v. United Penn Bank, supra* at 260, 525 A.2d at 1221."

The record provides ample evidence that the authority necessary to enter into the second contract was granted to Deborah Dierolf by Brian McHugh. In her deposition, Ms. Dierolf testified as follows:

"Q. Well, let me ask you about that. Did Brian McHugh often have you sign things on his behalf?

"A. Yes.

"Q. And when you did so, did you write his name as you did on the first agreement?

"A. Depends what it was. Most vendor agreements, when people were asking for who the president of the company was, yes, I would sign Brian's name. If it was an agreement that didn't require a title, I would often sign my name.

"Q. Now, when you would sign Brian's name to an agreement, would you do that without showing him the agreement first?

"A. No.

"Q. So every time you signed his name to an agreement, it was after he reviewed the agreement and told you to go ahead and sign it?

"A. Correct.

"Q. Now, when you signed agreements in your own name, did you follow that same procedure?

"A. Yes. Brian knew everything I signed. I signed contracts with Dempsey uniform and changed the contract several times. I signed an agreement with them, paying back uniforms that were taken out of the plant when we owed money. They charged a fee if uniforms left. There was a payment arrangement that was made . . . .

"Q. what was the purpose of that document that you signed, that you recall?

"A. Advance had worked—The only agreement that Advance Personnel and FDA had was the original, as far as I remember, vendor agreement, which was more of an informational piece. At this point, Advance Personnel was becoming the primary staffing unit for FDA in charge of supplying the whole building. And if they could not supply, then they were to go elsewhere and get other temps from other companies. As it ended up, Advance

ended up supplying the majority of the employees. Brian didn't care who supplied the temps or how they got there; just that the bodies were there on a daily basis.

"Q. How did this agreement come to be executed? Who physically handed you this document?

"A. Roe Larson brought it in after she had met with Brian and Scott McHugh. And I believe Rosemarie LaManna was there discussing the details of the document. This came a day or two later and needed signed [sic]. Brian and Scott had already worked out the details with Advance Personnel as the primary staffing company. It was held in the conference room.

"Q. Were you part of that meeting?

"A. No, I was not. I was told afterwards Advance was coming in. Roe was going to bring in the contract. They needed signed [sic].

"Q. Did anybody tell you what the agreement was between the parties?

"A. Just that Advance Personnel was going to be the primary supplier of temporary employees for FDA Packaging.

"Q. Who told you that?

"A. Brian.

"Q. And who told you that Roe Larson was going to be bringing in an agreement?

"A. Brian. Roe Larson was their contact, so she would have been the person bringing it in.

"Q. Did he tell you what that agreement was going to be?

"A. I just told you that. He told me that Advance Personnel was going to be the supplier of temporary—of all

the temporary employees for FDA. They were going to be the primary source. . . .

"Q. Now, when Rose Marie Larson brought in the document marked as Brian McHugh exhibit B, did—had it already been signed by her?

"A. No. She signed it when I signed.

"Q. So she brought it in and sat down with you?

"A. And we both signed it.

"Q. Both signed it together?

"A. Correct.

"Q. What did she do? Did she take it back?

"A. We made a copy to keep at FDA, and she took her copy, correct.

"Q. During that meeting, was there anybody else involved in that meeting?

"A. No.

"Q. So I take it then, based upon your description as to how this happened, you didn't show this document to Brian McHugh before you signed it?

"A. Yes. I left my office, showed Brian, came back. Roe stayed in my office. I signed the document.

"Q. When you showed Brian, what did you tell him?

"A. I said, here is the agreement that Roe brought in for Advance Personnel, I'm sure he did not read word for word the agreement.

"Q. Did you read it?

"A. Yes. Up til this point, Advance Personnel had been supplying temps to FDA, being paid on a regular basis. And even after this agreement, there was no lapse in them

supplying temps or lapse in FDA paying them. FDA may have paid them slowly at times based on cash flow, but there was no lapse in payment.

"Q. What did Brian McHugh say to you after you showed him this document?

"A. Take care of it, Deb. Like I said, Brian was focused on the plant and the plant making money. He didn't care how we got people; just that they were there . . . ." Oral deposition of Deborah Dierolf, May 6, 2005, pp. 8-9, 12-13 and 15-16.

For his part, Brian McHugh denies ever giving Deborah Dierolf authority to bind FDA to the second agreement. However, his son, Brian Scott McHugh (Scott McHugh), a 49 percent shareholder and vice president of FDA, expressly contradicted his father's testimony. In his testimony, Scott McHugh related that Deborah Dierolf was given the authority by Brian McHugh to sign contracts such as the second agreement. In fact, he stated that Brian McHugh's method was to avoid reading documents or paying attention to the nature of the transaction, conferring authority on another to handle it on his behalf to provide him the ability to deny being bound by the terms of the contract at a later point in time.

Scott McHugh's testimony is credible, for, among other things, it goes directly against his own interest. In speaking of the second agreement, he believes that FDA is bound by its terms and that this was "unfortunate." He only found out about the second agreement in approximately July of 2004 and was very unhappy about it.[6] He further testified that he and his father had a heated ex-

---

6. Oral deposition of Brian Scott McHugh, pp. 16-18, 52-53.

change about the second agreement after questioning his father whether he read the contract and how he could agree to its terms.[7]

On the issue at bar, this court finds credible the testimony of Deborah Dierolf and Scott McHugh, and finds the testimony of Brian McHugh to lack credibility. The deposition testimony established that FDA's common course of dealing was evident in the execution of the second agreement. Deborah Dierolf, within the scope of her authority, had the tacit approval of President McHugh to execute the agreement and did so. Subsequently, the parties performed under the terms of the agreement. It was not until over a year later, when Scott McHugh began questioning the existence of the second agreement and his father's methods, that the enforceability of the second agreement was called into question. Because we conclude that the second agreement is a valid, not a void, contract, Advance is entitled to rely on the terms of the second agreement and to proceed to arbitration in accordance with the arbitration provisions.

Therefore, we enter the following order:

## ORDER

And now, June 1, 2005, upon consideration of the emergency petition of FDA Packaging Inc. to stay arbitration, response thereto, briefs filed by the parties, and upon consideration of the record, this court denies the petition. Further, on motion of defendant, Advance Personnel Staffing Inc., the within declaratory judgment action is dismissed.

---

7. Oral deposition of Brian Scott McHugh, pp. 27-29.